**PUBLIC COPY – SEALED MATERIAL REDACTED**

ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE
———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
———————————————

No. 23-3019
———————————————

UNITED STATES OF AMERICA,                          Appellee,

v.

DAVID FLOYD,                                      Appellant.
———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
———————————————

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
ANTHONY F. SCARPELLI
DAVID T. HENEK
* KATHERINE M. KELLY
D.C. Bar #447112
Assistant United States Attorneys

* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
(202) 252-6829

Cr. No. 21-666 (TNM)

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellant, David Floyd, and appellee, the United States of America. There are no intervenors or amici.

## Rulings Under Review

Floyd challenges the judgment imposed following his January 11, 2023, sentencing hearing before the Honorable Trevor N. McFadden (Floyd Appendix 156-63; Floyd Sealed Appendix 169-225). No official citation exists.

## Related Cases

Appellee is unaware of any related cases.

PUBLIC COPY – SEALED MATERIAL REDACTED

# STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations other than those attached hereto are contained in the Addendum to the Brief for Appellant.

PUBLIC COPY – SEALED MATERIAL REDACTED

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE ............................................... 1

    The Plea Proceedings.................................................................... 2

        The Plea Agreement .............................................................. 2

            1.   The Factual Proffer.................................................... 3

            2.   The Sentencing Guidelines Analysis............................ 9

        The Plea Hearing ................................................................ 10

    The Sentencing ....................................................................... 15

        The Presentence Report ..................................................... 15

        The Sentencing Hearing...................................................... 15

            1.   The Ex Parte Hearing ................................................ 15

            2.   The Sentencing Proceedings ....................................... 20

                a.   The Government's Allocution ............................... 21

                b.   The Defense Allocution .......................................... 23

                c.   The District Court's Ruling.................................... 26

SUMMARY OF ARGUMENT ........................................................ 28

ARGUMENT .............................................................................. 29

    Floyd Has Not Established Ineffective Assistance of Counsel. ....... 29

      A.   Standard of Review................................................... 29

      B.   Applicable Legal Principles.................................... 30

            1.   Ineffective Assistance of Counsel ................................ 30

            2.   The Relevant Guidelines Law....................................... 32

C.   Discussion...............................................................34

   1.   Floyd Has Not Shown His Counsel Performed
        Deficiently. ...................................................34

   2.   Floyd Has Not Established Prejudice. .........................40

D.   In Any Event, Floyd's Suggested Remedies Are
     Inappropriate. ...................................................46

CONCLUSION....................................................................49

PUBLIC COPY – SEALED MATERIAL REDACTED

# TABLE OF AUTHORITIES*

## Cases

*Blackledge v. Allison*, 431 U.S. 63 (1977) ................................................. 35

*DiBiase v. United States*, 2023 WL 2376223
(2d Cir. Mar. 7, 2023) ............................................................................ 43

*Hill v. Lockhart,* 474 U.S. 52 (1985) ...................................30, 32, 41, 44

*Lafler v. Cooper,* 566 U.S. 156 (2012) .........................................30, 46-47

*Lee v. United States,* 582 U.S. 357 (2017) ......................................... 30, 44

*Padilla v. Kentucky,* 559 U.S. 356 (2010) ............................................. 47

*Premo v. Moore*, 562 U.S. 115 (2011) ..................................................... 44

*Strickland v. Washington,* 466 U.S. 668 (1984) .................30, 31, 34, 45

*United States v. Abney,* 812 F.3d 1079 (D.C. Cir. 2016) ....................... 29

*United States v. Anderson,* 618 F.3d 873 (8th Cir. 2010) ...................... 37

*United States v. Bagcho,* 923 F.3d 1131 (D.C. Cir. 2019) ..................... 33

*United States v. Bell*, 795 F.3d 88 (D.C. Cir. 2015) .................24, 33, 36

*United States v. Calderon,* 163 F.3d 644 (D.C. Cir. 1999) ........30, 38, 41

*United States v. Eli,* 379 F.3d 1016 (D.C. Cir. 2004).............................. 31

*United States v. Evans,* 98 F.4th 335 (D.C. Cir. 2024)............................ 40

*United States v. Gonzalez-Arias,* 946 F.3d 17
(1st Cir. 2019) ........................................................................................ 43

*United States v. Hall,* 370 F.3d 1204 (D.C. Cir. 2004) ........................... 46

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Henderson,* 108 F.4th 899 (D.C. Cir. 2024) ........... 30, 41

*United States v. McCloud,* 935 F.3d 527 (6th Cir. 2019) ................ 33, 37

*United States v. Miller*, 890 F.3d 317 (D.C. Cir. 2018) ......................... 24

*United States v. Murray,* 897 F.3d 298 (D.C. Cir. 2018) ...................... 31

*United States v. Pelligrini,* 929 F.2d 55 (2d Cir. 1991) .......................... 33

*United States v. Rashad,* 331 F.3d 908 (D.C. Cir. 2003) ....................... 48

*United States v. Scanlon,* 666 F.3d 796 (D.C. Cir. 2012) ...................... 47

**United States v. Sitzmann,* 893 F.3d 811 (D.C. Cir. 2018) ................. 48

*United States v. Smith,* 127 F.3d 1388 (11th Cir. 1997) ....................... 33

*United States v. Soto,* 132 F.3d 56 (D.C. Cir. 1997) ................................ 47

*United States v. Thomas,* 999 F.3d 723 (D.C. Cir. 2021) ............ 44-45, 48

*United States v. Wilkins,* No. 23-3051, 2024 WL 4903512
    (D.C. Cir. Nov. 27, 2024) ........................................................................ 41

## **Other Authorities**

18 U.S.C. § 922(g)(1) ................................................................. 23, 38, 42

18 U.S.C. § 3553(a) ................................................................. 10, 25-26

21 U.S.C. § 841(a)(1) ....................................................................... 1

21 U.S.C. § 841(b)(1)(B) ................................................................. 2

21 U.S.C. § 841(b)(1)(B)(ii) ........................................................... 1

21 U.S.C. § 846 ................................................................................ 1

21 U.S.C. § 851 ................................................................................ 2

D.C. Code § 22-4504(a) .................................................................. 8

U.S.S.G. § 1B1.3(a)(2) ................................................................. 36

U.S.S.G. § 1B1.3(a)(2) cmt. n.5(B)(i) ......................................... 36

U.S.S.G. § 2D1.1 cmt. n.11(A) ..................................................... 32

U.S.S.G. § 2D1.1(a)(5) ................................................................. 32

U.S.S.G. § 2D1.1(b)(1) .......... 3, 7-9, 15, 17, 20, 22-25, 28-29, 32-41, 43-46

U.S.S.G. § 2D1.1(c)(7) .............................................................. 9, 32

U.S.S.G. § 3E1.1 ........................................................................ 9, 38

PUBLIC COPY – SEALED MATERIAL REDACTED

# ISSUE PRESENTED

Whether appellant Floyd has established that his attorneys rendered ineffective assistance by agreeing to include as a term of Floyd's plea agreement an offense-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon during the charged conspiracy, where Floyd has failed to show his attorneys erred in agreeing to that term in negotiating a favorable plea agreement, and where Floyd has not asserted, let alone shown, that, but for the alleged error, there was a reasonable probability he would not have pleaded guilty and would have insisted on going to trial.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 23-3019
_____

UNITED STATES OF AMERICA,                          Appellee,

v.

DAVID FLOYD,                                       Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

BRIEF FOR APPELLEE
_____


## COUNTERSTATEMENT OF THE CASE

On November 9, 2021, appellant David Floyd was charged by

indictment with conspiracy to distribute and possess with intent to

distribute 500 grams or more of a mixture and substance containing a

detectable amount of cocaine (21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), 846)

(narcotics conspiracy) (Floyd Appendix (A) 18). Floyd entered a guilty

plea to narcotics conspiracy before the Honorable Trevor N. McFadden

PUBLIC COPY – SEALED MATERIAL REDACTED

on October 4, 2022 (A10, A33-56).

On January 11, 2023, Judge McFadden sentenced Floyd to 120 months of incarceration and 60 months of supervised release (A11; Floyd Sealed Appendix (SA) 221). Floyd filed an untimely notice of appeal, which the district court accepted upon granting Floyd's motion for an extension of time to file the notice (A168; Dkt.43; Dkt.47).[1]

## The Plea Proceedings

### *The Plea Agreement*

Floyd pleaded guilty to the narcotics-conspiracy count charged in the indictment and agreed that the "'Statement of Offense' fairly and accurately describe[d] [his] actions and involvement in the offense to which [he] [wa]s pleading guilty" (A21). In consideration for his guilty plea, the government agreed not to further prosecute Floyd for the conduct in the Statement of Offense and not to subject him to a mandatory 10 years of imprisonment under 21 U.S.C. §§ 841(b)(1)(B) and 851 (A21). The government also agreed not to prosecute Floyd for unlawful possession of a firearm on July 10, 2021, in Maryland (A21).

---

[1] "Dkt." refers to the district court docket entries.

PUBLIC COPY – SEALED MATERIAL REDACTED

Floyd signed the Statement of Offense, attesting, inter alia, that he: (1) had read each page and discussed it with his counsel; (2) fully understood the proffer of evidence and "agree[d] to it without reservation"; and (3) did so "voluntarily and of [his] own free will intending to be legally bound" (A68). Floyd attested that he was satisfied with his counsels' services regarding the proffer, his plea agreement, and "matters related to it" (A68).

## 1. The Factual Proffer

The proffer of evidence was divided into two sections entitled "Drug Conspiracy" and "Firearm Possession During Drug Conspiracy – U.S.S.G[. §] 2D1.1(b)(1)," respectively (A60, A65). The "Drug Conspiracy" proffer stated, in pertinent part, that from around June 2020 to about November 9, 2021, within the District of Columbia, the United States Virgin Islands (USVI), Puerto Rico, and elsewhere, Floyd conspired with others to distribute, and possess with the intent to distribute, 500 grams or more of cocaine in Washington, DC, and Maryland (A60-61). Specifically, Homeland Security Investigations (HSI) obtained information that Floyd, who lived in Washington, DC, "was involved in the importation and distribution of kilogram quantities of cocaine" (A61).

PUBLIC COPY – SEALED MATERIAL REDACTED

Law enforcement obtained text messages between Floyd and a cocaine supplier in St. Thomas, USVI, three days before Floyd attempted to mail two kilograms of cocaine from St. Thomas to Washington, DC, as described infra (A63-64). Floyd texted the cocaine supplier stating, "grab 1 of each I should be around Monday," to which the supplier responded, "Ok" (A64). On January 19, 2021, Floyd and his brother, Bennie Floyd, (Bennie) flew to St. Thomas to obtain kilograms of cocaine to distribute in the Washington, DC, area (A61).[2]

On January 20, 2021, after obtaining two kilograms of cocaine in St. Thomas, Floyd and Bennie mailed two packages from a St. Thomas post office to addresses in Washington, DC (A61). As captured on surveillance video, Bennie mailed the packages at the post-office counter while Floyd stayed in the driver's seat of a rental car (A63). Bennie then returned to the rental car driven by Floyd, and they went to the St. Thomas Airport and boarded a return flight to Washington, DC (A63).

---

[2] The proffer noted that in Case 21-cr-200 (TNM), Bennie Floyd pleaded guilty to conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine; on November 1, 2021, he was sentenced to 72 months of imprisonment (A61).

Later that day, U.S. Customs and Border Protection (CBP) officers assigned to the St. Thomas post office inspected a U.S. Postal Service (USPS) package addressed to Darrell Ward at 1122 Bladensburg Road, NE, #209, Washington, DC (Package 1), after being alerted to the package by a CBP narcotics-detection dog (A61). Records searches revealed no information that someone named Darrell Ward had ever lived at that address (A62). CBP officers X-rayed Package 1, revealing "a brick-shaped anomaly" (A62). Inside the package, they discovered a box containing "a vacuum-sealed bag, covered in spray foam and wet black paint" (A62). After removing the vacuum-sealed bag, CBP officers discovered a white powdery substance, weighing approximately 1,012 grams, which yielded a positive field-test result for cocaine (A62).

Also on January 20, 2021, based on information from officers in St. Thomas regarding the seizure of Package 1, CBP officers assigned to the San Juan International Mail Branch in Puerto Rico, inspected a USPS express-mail package from the USVI that was bound for Washington, DC (Package 2) (A62). Package 2 was addressed to Mai Coleman at 1243 16th St, NE, Apt. #1, Washington, DC (A62). Records searches revealed that Mai Coleman was a listed resident of the apartment next door to the

PUBLIC COPY – SEALED MATERIAL REDACTED

recipient address on Package 2 (A62). Inside Package 2, CBP officers discovered a cardboard box which had been modified to look like a large book (A63). That box contained approximately 1,022 grams of a white powdery substance, which yielded "a positive reaction for cocaine" (A63).

On January 21, 2021, HSI agents observed Bennie enter the apartment complex at 1122 Bladensburg Road, NE, by using a key fob on an access-controlled door (A63). Agents heard Bennie ask the mail carrier in the mailroom if there was "any mail for apartment 209"; the mail carrier replied there was not (A63). Bennie then left the building (A63). On January 29, 2021, law-enforcement officers conducted a controlled delivery of Package 1 to 1122 Bladensburg Road, NE, #209 (A63). After Bennie accepted the package, he was arrested (A63).

On October 7, 2021, the Honorable Colleen Kollar-Kotelly authorized a 30-day wiretap on Floyd's phone (A64). From the resulting interceptions, "it was apparent that [Floyd] continued to distribute illegal substances" (A64).

On November 10, 2021, law-enforcement officers executed search warrants at residences located at: (1) Heath Street, Capitol Heights, Maryland, where Floyd spent his evenings and was arrested; (2) Meigs

PUBLIC COPY – SEALED MATERIAL REDACTED

Place, NE, where Floyd conducted drug-trafficking activities; and (3) W Street, SE, where Floyd also conducted drug-trafficking activities (A64).

Specifically, at the Heath Street residence, officers recovered over $3,000, personal items belonging to Floyd, and the cellphone that was the basis of the wiretap (A65).

The Meigs Place residence was owned by Floyd's mother and was protected by a security system (A64). Officers saw Floyd travel there almost daily during the drug conspiracy and distribute illegal drugs from there (A64). During the search, officers recovered, inter alia, $1,980, approximately 700 grams of marijuana, and packaging materials used to distribute illegal narcotics (A64).

Floyd rented the W Street residence and visited it almost daily before going to the Meigs Place residence (A64-65). During the search of the W Street residence, officers recovered $28,500, "a loaded Glock 19, 9mm firearm, a scale for weighing drugs, a money counter, items used to distribute illegal drugs, and [Floyd's] passport and driver's license" (A65).

The "Firearm Possession During Drug Conspiracy – U.S.S.G[. §] 2D1.1(b)(1)" proffer stated, in pertinent part, that on or about March 12, 2021, Floyd mailed a package at the U.S. Post Office at 1563 Maryland

PUBLIC COPY – SEALED MATERIAL REDACTED

Avenue, NE (A65). The listed sender on the package was Carolyne Hughes at a Meigs Place address similar to the Meigs Place address that Floyd frequented (A65). The listed package recipient was Daniella Hughes at "Cassava Road nummer [sic] 5, Sint-Maarten" (A65).

On or about March 22, 2021, law-enforcement officers in St. Maarten seized that package (A65). The package contained two firearms: (1) a Taurus Millennium G2, 9mm firearm; and (2) a Polymer 80, 9mm firearm with no serial number (a "ghost gun") (A65). The package also contained three firearms magazines, two of which were extended magazines capable of holding at least 30 rounds each (A65). The package further contained 37 rounds of ammunition, some of which were hollow-point rounds (A65).

Furthermore, the § 2D1.1(b)(1) proffer stated that in D.C. Superior Court Case F-7226-02, Floyd had pleaded guilty to carrying a pistol without a license, in violation of D.C. Code § 22-4504(a), and that on November 10, 2004, he was sentenced to 15 months' imprisonment and three years of supervised release (A66). Floyd acknowledged that when he shipped the firearms on March 12, 2021, he knew that he had a prior felony conviction and that he could not possess firearms (A66).

PUBLIC COPY – SEALED MATERIAL REDACTED

Finally, Floyd agreed that "during the course of the conspiracy, he [wa]s accountable for at least two kilograms of cocaine but less than 3.5 kilograms," which represented the total amount that he distributed, possessed with the intent to distribute, "or was reasonably foreseeable conduct of the co-conspirators" (A66).

## 2. The Sentencing Guidelines Analysis

The plea agreement included an "Estimated Offense Level Under the Guidelines," in which the parties agreed that the following provisions applied:

| | | |
|---|---|---|
| U.S.S.G. § 2D1.1(c)(7) | Base Offense Level | 26 |
| U.S.S.G. § 2D1.1(b)(1) | Possession of a Firearm | 2 |
| | Total | 28 |

(A22). The government agreed that a three-level reduction of Floyd's offense level was appropriate based on his acceptance of responsibility under U.S.S.G. § 3E1.1 (A22).[3] Based on these calculations, Floyd's estimated offense level was "at least 25" (A22). Furthermore, the plea agreement estimated that Floyd had 12 criminal-history points and a

---

[3] However, the plea agreement also stated that the government could oppose the acceptance-of-responsibility adjustment if Floyd moved to withdraw his guilty plea (A22).

9

PUBLIC COPY – SEALED MATERIAL REDACTED

criminal-history category of V, and thus his estimated guidelines range was 100-125 months (A24).

The parties agreed not to seek any offense-level calculation different from this Estimated Offense Level, except as provided in the "Reservation of Allocution" section of the plea agreement (A25). The "Reservation of Allocution" section, inter alia, allowed the parties to address the correctness of any guidelines calculations by the presentence report (PSR) writer or the court, even if those calculations differed from the estimated guidelines range in the plea agreement (A25). The parties further agreed that a sentence within the estimated guidelines range would constitute a reasonable sentence pursuant to the 18 U.S.C. § 3553(a) factors, but that Floyd reserved the right to seek a sentence below that estimated range based on the § 3553(a) factors (A25).

Under the plea agreement, Floyd generally waived his right to appeal his conviction and sentence, although he retained the right to appeal based on ineffective assistance of counsel (A28).

### *The Plea Hearing*

At the outset of the plea hearing, the district court repeatedly told Floyd to inform the court if there was something he did not understand

PUBLIC COPY – SEALED MATERIAL REDACTED

(A35-36, A38). After reminding Floyd that he was under oath and that he could be prosecuted for perjury if he provided untruthful answers, Floyd confirmed that he: (1) was completely satisfied with the services of his attorneys; (2) had enough time to discuss the charge and the decision to plead guilty; (3) had received and read the indictment; and (4) had fully discussed the indicted charge and "the case in general" with his counsel (A35-38).

Regarding the Statement of Offense filed with the plea agreement and discussed supra (A58-68), Floyd confirmed that: (1) he had read and fully discussed the document with his counsel; (2) his signature indicated that he had read and agreed to it; and (3) the Statement of Offense accurately described his criminal conduct (A40).

Thereafter, the prosecutor summarized the evidentiary proffer, which was set forth in more detail in the Statement of Offense (A41-43). As part of that summary, the prosecutor stated that Floyd was "admitting" and "accepting" that he "possessed a firearm during the course of the drug trafficking conspiracy" (A42-43). Specifically, on or about March 12, 2021, Floyd mailed two firearms—a Taurus Millenium, 9mm and a Polymer80, 9mm—which were seized by police (A42-43).

PUBLIC COPY – SEALED MATERIAL REDACTED

After that factual proffer, when the court asked Floyd if he had done the things the prosecutor stated, Floyd responded, "Yes, sir" (A43).

Defense counsel summarized the terms of the plea agreement, stating that Floyd would plead guilty to one conspiracy charge and the government had agreed not to prosecute Floyd for other crimes "including the charge of mailing guns and a charge of possession of a firearm during the course of the conspiracy" (A44). The prosecutor added, inter alia, that the plea agreement contained sentencing-guidelines calculations, including an offense level of 28 "based on the amount of cocaine and possession of a firearm," and that "the estimated offense level is at least 25" (A44-45). The prosecutor stated that Floyd was agreeing that he had 12 criminal-history points and a Category V criminal history, which produced an estimated guidelines range of 100-125 months (A45).

In response to the court's inquiry about the potential sentence, Floyd responded that he understood but he believed "[t]he points in the guidelines" were incorrect (A45). The prosecutor explained that "the plea agreement is explicit that these are just estimates" and that Floyd was "agreeing to . . . the estimates in the agreement" (A45-46). The prosecutor confirmed for the court that the parties agreed that the estimated

PUBLIC COPY – SEALED MATERIAL REDACTED

guidelines range of 100-125 months would be considered a reasonable sentence (A46). Floyd confirmed that he understood that aspect of the plea agreement, and that his attorney could seek a different sentence (A46).

Floyd confirmed that he had read the plea agreement carefully, discussed it with his counsel, and understood it (A47). Floyd stated that he had had enough time to talk with his counsel about the plea agreement (A47). Thereafter, when the court asked if Floyd and his counsel had "talked about sentencing and how the statute and sentencing guidelines may apply to [his] case," Floyd said, "No" (A48). Defense counsel immediately requested a break to speak with Floyd, which the court granted (A48).

After the break, Floyd confirmed that he had talked with his counsel about sentencing and how the statute and sentencing guidelines might apply to his case (A48-50). The court noted that Floyd disagreed with the government's estimate of his criminal-history points (A50). The court emphasized that "those numbers in the sentencing agreement are what the government thinks you're going to face based on what they calculate to be the appropriate offense level and your appropriate

PUBLIC COPY – SEALED MATERIAL REDACTED

criminal history," and that "the actual numbers" would not be known until the Probation Office made its own sentencing-guidelines calculations (A50-51). The court also explained that Floyd and the government would have an opportunity to object to the Probation Office's guidelines calculations and, at sentencing, the court would determine Floyd's guidelines range, which might differ from the government's estimate in the plea agreement (A51). Floyd confirmed that he understood these details (A51).

Near the end of the hearing, Floyd confirmed that he was entering his guilty plea voluntarily because he was guilty and that there was nothing that he did not understand (A53-54). When asked by the court, Floyd confirmed that there was nothing he wanted to ask his attorney or the court before entering his plea (A54). The court accepted Floyd's guilty plea to narcotics conspiracy as set forth in the indictment (A54). Thereafter, the court explained that Floyd and his counsel would have an opportunity to read the PSR and file objections to it before sentencing and they would have an opportunity to speak to the court at the sentencing hearing (A55).

PUBLIC COPY – SEALED MATERIAL REDACTED

# The Sentencing

## *The Presentence Report*

The PSR's sentencing-guidelines computations mirrored those in the plea agreement, including a two-level enhancement for the specific offense characteristic of possessing a dangerous weapon under U.S.S.G. § 2D1.1(b)(1) (SA235, SA254). Floyd lodged no objections to these calculations with the PSR writer (SA262-63).

## *The Sentencing Hearing*

At the beginning of the hearing, defense counsel told the court that Floyd had made several statements indicating that he believed counsel had "not been effective" and had "not made accurate representations" (SA171-72). Defense counsel asked the court to appoint "conflicts counsel" (SA172). Before addressing that request, the court chose to speak with Floyd and defense counsel ex parte (SA172).

### 1. The Ex Parte Hearing

During the ex parte discussion, Floyd stated that, inter alia, █

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

15

PUBLIC COPY – SEALED MATERIAL REDACTED

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

The court responded that ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

PUBLIC COPY – SEALED MATERIAL REDACTED



Defense counsel then addressed



PUBLIC COPY – SEALED MATERIAL REDACTED

The court ruled that ████████████████████████████████

PUBLIC COPY – SEALED MATERIAL REDACTED

PUBLIC COPY – SEALED MATERIAL REDACTED

 When

the government rejoined the proceedings, the court announced that it had

denied any motion to remove defense counsel and had found no evidence

of ineffective assistance (SA185).

## 2. The Sentencing Proceedings

Before imposing sentence, the court summarized the PSR's
guidelines calculations (A192-93). Among the offense-level calculations,
the court cited the Probation Office's finding that the base-offense level
should be enhanced by two levels under § 2D1.1(b)(1) because Floyd
"possessed a firearm during the commission of the crime" (SA192). The
court found that Floyd's total offense level was 25 (SA193). Neither party
objected to this offense-level calculation (SA193).

20

PUBLIC COPY – SEALED MATERIAL REDACTED

The government, the Probation Office, and defense counsel—after consulting with Floyd—agreed that Floyd had 12 criminal-history points and a Category V criminal history (SA189-90). The court agreed with this calculation (SA193). Thus, the court calculated Floyd's applicable guidelines range as 100-125 months (SA193). Neither party objected to this guidelines range (SA193-94).

### a.     The Government's Allocution

During the government's allocution, the prosecutor expanded upon the claims presented in its sentencing memorandum (A86-98) and advocated for a 120-month sentence, which, as the memorandum noted, included a five-year mandatory-minimum sentence (A86; SA198). Contrary to Floyd's claim that he became involved in the conspiracy only after Bennie was released from prison, Floyd was the conspiracy's "ringleader" or "primary person," and Floyd involved Bennie "to minimize his own criminal exposure" (A93; SA199). Floyd had taken multiple trips to the USVI, whereas Bennie had traveled there once with Floyd (SA199-200). Floyd corresponded directly with the cocaine supplier; Floyd was intercepted at the airport with a significant amount of cash after a flight from the USVI; and the wiretap evidence showed that Floyd had engaged

PUBLIC COPY – SEALED MATERIAL REDACTED

in drug trafficking in Washington, DC, whereas Bennie did not distribute drugs in the District (SA199). Also, unlike Bennie, Floyd was linked to three residences, over $30,000 in seized cash, and at least three firearms despite being a convicted felon (SA200). Floyd mailed two firearms and ammunition to St. Maarten, and a third firearm was seized from one of Floyd's residences (SA200). Also, despite being a convicted felon, on July 10, 2021, during the narcotics-trafficking conspiracy, Floyd fired a gun at a Maryland firing range, as shown in photos included in the government's sentencing memorandum (A96; SA200-01).

The prosecutor also cited Floyd's escalating history of drug trafficking, which began when he was 18 years old, and in one case involved the seizure of a firearm (A95-96; SA201-02). The prosecutor noted the expanse of Floyd's current drug-trafficking enterprise which involved at least two kilograms of powder cocaine (SA201).

In its sentencing memorandum, the government reiterated the evidentiary proffer Floyd agreed to at the plea hearing, including the evidence supporting the two-level enhancement under U.S.S.G. § 2D1.1(b)(1) based on the firearms Floyd mailed to St. Maarten, and included photos of those firearms (A87-94).

PUBLIC COPY – SEALED MATERIAL REDACTED

The prosecutor asserted that the plea agreement had afforded Floyd "a significant benefit" (SA202). The government had: (1) agreed not to charge him under 18 U.S.C. § 922(g)(1) for possessing the gun at the Maryland firing range; and (2) not pursued another § 922(g)(1) charge for the "two firearms that had an extended magazine" (an apparent reference to the two guns and two large-capacity magazines Floyd mailed to St. Maarten: A65, A92-94) (A97; SA200, SA203).

### b.    The Defense Allocution

Echoing the arguments in the defense sentencing memorandum (A69-85), counsel asserted that a 72-month sentence was warranted because Floyd's criminal-history score, albeit correctly calculated, overstated the severity of his conduct (A69-70, A75-76; SA204-06, SA209). Counsel asserted that Floyd's criminal history consisted of low-level drug offenses until Bennie was released from prison and devised the narcotics conspiracy, and that Bennie played a more significant role in the two-kilogram shipment of cocaine in this case (A70, A73, A75, A81; SA205-07).

In the written sentencing memorandum, counsel argued against the "mechanical application" of the U.S.S.G. § 2D1.1(b)(1) enhancement

PUBLIC COPY – SEALED MATERIAL REDACTED

(A77-79). Floyd acknowledged that "on March 22, 2021[,] law enforcement intercepted a package shipped by David Floyd that contained two firearms and ammunition" (A74). Floyd stated that he had "accepted responsibility for the offense" and "agreed to the Government's inclusion of the enhancement as part of its sentencing calculation supporting his guilty plea" (A77). He acknowledged that § 2D1.1(b)(1) applies "whenever a firearm is possessed during conduct relevant to the offense of conviction," which "includes acts that were part of the same course of conduct or common scheme or plan as the offense of conviction" (A77 (quoting *United States v. Bell*, 795 F.3d 88, 105 (D.C. Cir. 2015))). Floyd noted that to apply § 2D1.1(b)(1), "a nexus must be shown between the weapon and the criminal act" (A77 (quoting *United States v. Miller*, 890 F.3d 317, 328 (D.C. Cir. 2018)). Floyd asserted that there was no evidence that he "used or discharged the firearm *at all* in connection with a narcotics offense, no evidence that he used the firearm to further or support any threatening or intimidating conduct, and no evidence that [he] utilized the firearm in the course of the conspiracy" (A77-78 (emphasis in original)). Thus, Floyd argued that the court could consider "the role (or lack thereof) the firearm played in the alleged conspiracy,

and its violent (or nonviolent) use" in assessing the § 3553(a) sentencing factors (A78). Accordingly, he argued that "a Guidelines sentence under § 2D1.1(b)(1)" here would overstate the seriousness of the offense because the firearm was not used, let alone in a threatening way, during any drug trafficking (A78).

During the sentencing hearing, in apparent reference to the guns Floyd mailed to St. Maarten, defense counsel noted that "the gun" was part of Floyd's plea proffer "and he did not contest at the time that it was part of the conspiracy" (SA206). Counsel added, "we're not contesting that today" (SA206). Counsel noted, however, that the court should consider "that the gun was not used in a violent way, that he was not just holding the gun and selling drugs at the time" (SA206).

In his own statement, Floyd asserted that he had only dealt in marijuana, and never in cocaine, and that his trips to St. Thomas were not drug related (SA210-11). In apparent reference to the packages of cocaine mailed from the USVI, Floyd stated that he had not gone into "the post office and mailed anything," and he had merely assisted Bennie "by getting in the car and giving him directions" (SA210). More generally, Floyd claimed that he only assisted in "the activities that [Bennie]

PUBLIC COPY – SEALED MATERIAL REDACTED

wanted to do," but admitted that he was "wrong for doing that" (SA210).

When the court asked about "the guns," Floyd responded, "Well, I'm not gonna say I didn't have anything to do with guns" (SA211). He indicated that firing a gun at the Maryland range was a step in trying to obtain a gun license despite his status as a felon (SA211-13). The court redirected Floyd, explaining that it was referring to "the two guns that [Floyd] mailed to St. Maarten" (SA212-13). Floyd responded that regarding the "guns that w[ere] mailed, yes, I was wrong. And I admit to that, your Honor." (SA213.)

### c.    The District Court's Ruling

In sentencing Floyd to 120 months of imprisonment and five years of supervised release, the court explained its reasoning regarding the § 3553(a) factors (SA213, SA221). The court noted, inter alia, that for "well over a year," Floyd was "involved in an international conspiracy to distribute significant amounts of cocaine," and Floyd had admitted sending two packages of cocaine, each weighing more than 1,000 grams, from the USVI to the District (SA213). The court found that "this was a sophisticated and well-thought-out conspiracy," and that Floyd was a "significant cog in a process," "not just a street-level dealer" (SA214). The

PUBLIC COPY – SEALED MATERIAL REDACTED

court found that Floyd continued his illegal activities after Bennie's arrest by "mailing two guns, one of which was a ghost gun, and ammunition, including hollow-point rounds[,] to an address in St. Maarten" (SA214). The court found this mailing to be "an extremely troubling part of [Floyd's] conduct," noting that, as a felon, Floyd was barred from possessing guns, ghost guns could not be traced, and hollow-point rounds cause severe bodily harm (SA214-15).

The court found that except for "a few years before this current conspiracy," Floyd had been "almost continually in trouble with the law," and rejected the argument that Floyd's criminal-history category overstated his true criminal history (SA215-16).

The court rejected Floyd's request for the same sentence meted out to Bennie and his argument that Bennie was responsible for Floyd's actions (SA218). The court found that Floyd's long record of drug-distribution-related offenses suggested that Floyd was "a full partner in this scheme," as did his prior conviction for a similar crime "involving mailing drugs and the presence of firearms" (SA218). Also, the court found that Floyd was the one who distributed drugs from his residence and was involved with the drug supplier, and "[m]ore importantly," after

27

Bennie's arrest, Floyd "doubled down," by using a gun at the shooting range, and mailing the two guns (SA218-19).

The court further considered the significant benefit Floyd had received from the government's agreement not to charge separate gun offenses in this case (SA220). When the court asked at the end of the hearing, the parties had no objections to the sentence that had not already been noted on the record (A223).

## SUMMARY OF ARGUMENT

Floyd's attorneys did not render ineffective assistance by negotiating a plea agreement with a § 2D1.1(b)(1) enhancement. The evidence linking the guns Floyd mailed to St. Maarten during the narcotics conspiracy to which he pleaded guilty was sufficient to support the § 2D1.1(b)(1) enhancement. Also, the overall terms of the plea agreement which defense counsel negotiated provided significant benefits to Floyd, outweighing any alleged error in accepting the § 2D1.1(b)(1) enhancement and showing that counsel did not perform deficiently. Furthermore, Floyd informed the district court that, ███████

███████████████████████████████████████████████████

PUBLIC COPY – SEALED MATERIAL REDACTED

███████████████████████████████████████

███████████████

Moreover, Floyd has not demonstrated prejudice. He has not alleged, let alone shown, that but for his counsels' allegedly erroneous acceptance of the § 2D1.1(b)(1) enhancement in the plea agreement, there was a reasonable probability he would not have pleaded guilty and would have insisted on going to trial. Nor may Floyd credibly suggest that the government would have presented a more lenient plea offer had his counsel objected to the § 2D1.1(b)(1) enhancement based on the St. Maarten guns. The government could have based the enhancement on the gun discovered in Floyd's W Street apartment.

## ARGUMENT

### Floyd Has Not Established Ineffective Assistance of Counsel.

#### A.    Standard of Review

This Court reviews de novo the district court's denial of an ineffective-assistance-of-counsel claim. *United States v. Abney,* 812 F.3d 1079, 1087 (D.C. Cir. 2016).

PUBLIC COPY – SEALED MATERIAL REDACTED

## B.    Applicable Legal Principles

### 1.    Ineffective Assistance of Counsel

"The Sixth Amendment guarantees a defendant the effective assistance of counsel at 'critical stages of a criminal proceeding,' including when he enters a guilty plea." *Lee v. United States,* 582 U.S. 357, 363 (2017) (quoting *Lafler v. Cooper,* 566 U.S. 156, 165 (2012)). An ineffective-assistance-of-counsel claim regarding a guilty plea is governed by *Strickland v. Washington,* 466 U.S. 668 (1984). *See Hill v. Lockhart,* 474 U.S. 52, 58 (1985). To succeed, the defendant first must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The defendant's burden is a heavy one because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Second, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59; *accord United States v. Henderson,* 108 F.4th 899, 903 (D.C. Cir. 2024); *United States v. Calderon,* 163 F.3d 644, 646 (D.C. Cir. 1999). A court need not address

30

PUBLIC COPY – SEALED MATERIAL REDACTED

"both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland,* 466 U.S. at 697. Failure to meet either component defeats the ineffectiveness claim. *Id.* at 700.

Contrary to Floyd's claim (at 17, 23-24), the prejudice standard set forth in *United States v. Murray,* 897 F.3d 298, 312 (D.C. Cir. 2018), and *United States v. Eli,* 379 F.3d 1016, 1019 (D.C. Cir. 2004), does not apply here.[5] Both of those cases addressed the prejudice prong of *Strickland*'s ineffective-assistance analysis in the context of alleged sentencing error by counsel, not alleged error regarding the negotiation of a plea agreement. *See Murray,* 897 F.3d at 311-12 (quoting *Eli* standard for "establish[ing] prejudice in the sentencing context" where defendant alleged counsel was deficient for not objecting at sentencing when prosecutor recommended sentence higher than set by plea agreement, thus breaching plea agreement); *Eli,* 379 F.3d at 1018, 1022 & n.10 (although defendant entered guilty plea, the only prejudice he asserted was length of his sentence). Because Floyd clearly claims (at 1, 16, 18-23)

---

[5] In *Murray,* this Court stated that "[t]o establish prejudice in the sentencing context, a defendant need only show a 'reasonable probability that, but for counsel's unprofessional errors, the result of [sentencing] would have been different.'" 897 F.3d at 312 (citing *Eli,* 379 F.3d at 1019).

PUBLIC COPY – SEALED MATERIAL REDACTED

that his counsel rendered ineffective assistance in negotiating his plea agreement, the *Hill* prejudice standard applies here. 474 U.S. at 59.

## 2.    The Relevant Guidelines Law

Under Chapter 2, Part D of the Sentencing Guidelines for "Offenses Involving Drugs and Narco-Terrorism," U.S.S.G. § 2D1.1(a)(5) relies upon the Drug Quantity Table to establish a base-offense level. Here, because the narcotics conspiracy involved at least two kilograms, but less than 3.5 kilograms, of cocaine, the Drug Quantity Table provided a base-offense level of 26. U.S.S.G. § 2D1.1(c)(7). Under the specific offense characteristic of U.S.S.G. § 2D1.1(b)(1), the base-offense level is increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed." As the Application Notes explain, the § 2D1.1(b)(1) enhancement "reflects the increased danger of violence when drug traffickers possess weapons," and "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.11(A).

Generally, for § 2D1.1(b)(1) to be applicable, the government must show by a preponderance of the evidence that: (1) the defendant possessed a weapon; and (2) the possession was during the commission

PUBLIC COPY – SEALED MATERIAL REDACTED

of the offense. *United States v. McCloud,* 935 F.3d 527, 531 (6th Cir. 2019). Upon making this showing, a presumption arises that the weapon possession was connected to the offense. *Id.* The burden then shifts to the defendant to show that it was clearly improbable that his possession of the weapon was connected to the offense. *Id.* The applicability of § 2D1.1(b)(1) "depends on whether the conduct at issue is 'relevant' to the offense of conviction." *Bell,* 795 F.3d at 105 (quoting *United States v. Pelligrini,* 929 F.2d 55, 56 (2d Cir. 1991)). "The enhancement is to be applied whenever a firearm is possessed during conduct relevant to the offense of conviction, which includes acts that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* (quoting *United States v. Smith,* 127 F.3d 1388, 1390 (11th Cir. 1997)) (cleaned up).[6]

---

[6] Floyd's citation (at 22-23) to *United States v. Bagcho,* 923 F.3d 1131 (D.C. Cir. 2019), does not alter this legal standard. In *Bagcho,* this Court addressed whether there was sufficient evidence that the defendant constructively possessed the firearm. *Id.* at 1138. The defendant did not contest that the firearm was connected to drug-trafficking activities for purposes of § 2D1.1(b)(1). *Id.*

PUBLIC COPY – SEALED MATERIAL REDACTED

## C. Discussion

### 1. Floyd Has Not Shown His Counsel Performed Deficiently.

Floyd claims (at 21-22) that defense counsel should not have agreed to the application of § 2D1.1(b)(1) because the plea agreement's factual proffer failed to connect the firearms and ammunition he mailed to St. Maarten to the drug-trafficking conduct. He claims (at 22) that mailing the firearms "was an independent act that was not necessary to the drug charge." The record belies Floyd's ineffectiveness claim. After defense counsel carefully reviewed the evidence with him, Floyd executed the plea agreement containing the gun enhancement. Because the § 2D1.1(b)(1) enhancement had a sufficient factual and legal basis and the overall plea agreement significantly benefitted Floyd, counsels' performance easily fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The existing record establishes that Floyd entered the plea agreement knowingly and voluntarily after consultation with competent counsel. While under oath at the plea hearing, Floyd agreed to the factual proffer's accuracy regarding the St. Maarten guns, and stated that he had read the factual proffer, had fully discussed the proffer and the case with

34

PUBLIC COPY – SEALED MATERIAL REDACTED

his counsel, and that he was completely satisfied with his counsel (A35-38, A40). Floyd later stated at the ex parte hearing that ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ In response, defense counsel told the court that ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Under these circumstances, Floyd has not shown deficient performance and should be held to his plea agreement. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (representations made during plea colloquy "constitute a formidable barrier" to any subsequent challenge to the agreement; "[s]olemn declarations in open court carry a strong presumption of verity").

Given the evidence, defense counsel made a reasonable strategic decision to include the § 2D1.1(b)(1) enhancement in the plea agreement. For two or more offenses to constitute part of a common scheme or plan,

PUBLIC COPY – SEALED MATERIAL REDACTED

they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3(a)(2) cmt. n.5(B)(i) (emphasis in original); *see also Bell,* 795 F.3d at 105; U.S.S.G. § 1B1.3(a)(2).[7] Here, by mailing the guns, magazines, and ammunition to St. Maarten, Floyd employed the same *modus operandi* as mailing the packages of cocaine from the USVI to the District: all the packages were mailed via the postal service under the names of other senders (A61-63, A65). Indeed, the sender's address on the St. Maarten gun package was 1613 Meigs Place, akin to the Meigs Place address from which law-enforcement officers observed Floyd distribute illegal drugs and at which they discovered drug-trafficking evidence during their search (A64-65). Floyd mailed the guns to St. Maarten while the narcotics conspiracy was ongoing (A60, A65). Furthermore, the mailed guns and ammunition were not the only firearms and ammunition Floyd possessed during the narcotics conspiracy; Floyd kept a loaded Glock firearm at his W Street

---

[7] Floyd's assertion (at 22) that to properly apply § 2D1.1(b)(1), mailing the firearms to St. Maarten had to be "necessary to the drug charge" lacks merit. Floyd cites no legal authority for that assertion, and neither U.S.S.G. § 1B1.3(a)(2) nor § 2D1.1(b)(1) supports it.

PUBLIC COPY – SEALED MATERIAL REDACTED

apartment along with a large amount of cash and items used in his illegal-drug distribution (A64-65). Both the gun in his W Street apartment and the guns Floyd mailed to St. Maarten were 9mm firearms (A65). Thus, the nexus between the mailed guns and the narcotics conspiracy was sufficient to apply the § 2D1.1(b)(1) enhancement, and Floyd has not shown that it is clearly improbable that this gun possession was connected to the narcotics conspiracy. *See McCloud,* 935 F.3d at 528-30, 532-33 (affirming § 2D1.1(b)(1) enhancement for defendant's possession of handgun during trip to Detroit to meet marijuana supplier within timeframe of defendant's methamphetamine-distribution conspiracy in other Michigan cities, where, inter alia, Detroit trip had similar modus operandi of trying to obtain drugs in Detroit and defendant also was involved in marijuana distribution); *United States v. Anderson,* 618 F.3d 873, 882 (8th Cir. 2010) ("This [§ 2D1.1(b)(1)] Guidelines enhancement creates a very low bar for the government to hurdle. If it is 'not clearly improbable' that the firearm was connected to Anderson's drug activity, then the enhancement applies. Handguns are a recognized tool of the drug trafficking trade, Anderson exhibited a pattern of hiding assets to avoid detection, and Anderson had no credible,

PUBLIC COPY – SEALED MATERIAL REDACTED

legitimate explanation for the possession of this firearm--these facts satisfy the government's low burden of proof.").

Additionally, the overall terms of the plea agreement which defense counsel negotiated on Floyd's behalf show that counsel did not perform deficiently. Floyd received significant benefits under the plea agreement which outweighed any alleged error in accepting the § 2D1.1(b)(1) enhancement. Those benefits included, at the very least, the government's agreement not to: (1) prosecute him under § 922(g)(1) for his unlawful possession of a firearm at the Maryland firing range; and (2) further prosecute him for conduct set forth in the Statement of Offense, which could have included two § 922(g)(1) charges for constructively possessing the Glock handgun at his W Street apartment, and possessing the guns he mailed to St. Maarten had that conduct not been used as grounds for the § 2D1.1(b)(1) enhancement (A21, A64-66, A96-97). Also, by accepting the guilty plea, Floyd received a three-level offense-level reduction for acceptance of responsibility under § 3E1.1, which he would not have received if he had gone to trial (A22). *See Calderon,* 163 F.3d at 646 (counsel did not act deficiently by agreeing to plea-agreement clause limiting legal grounds which defendant could

PUBLIC COPY – SEALED MATERIAL REDACTED

assert to reduce her sentence, because it was within realm of valid strategic decisions not to seek adjustments to base-offense level where government was willing to drop a charge and forego seeking adjustments that would increase defendant's sentence).

The Court should reject Floyd's contrary claims. Defense counsel's ████████████████████████████████████████████ and Floyd's own statements ███████████████████████████████ ████████████████████████████████ undercut Floyd's generalized allegation (at 19-21) that he did not fully understand the guidelines calculations, and therefore the gun enhancement, when he entered his guilty plea. Floyd's citation to his plea-hearing assertion that his criminal-history score was inaccurate does not pertain to the gun enhancement. Indeed, Floyd's assertion at the ex parte hearing that █ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████

Also, after Floyd took a break during the plea hearing to discuss the sentencing guidelines with counsel, Floyd assured the court that he and his attorneys had adequately discussed the guidelines (A48-50). Floyd did

not claim during the plea hearing that he did not understand the gun enhancement, or that its application was improper, even when the court asked him if there was anything he did not understand about his plea, or anything Floyd wanted to ask the court or his counsel before entering his plea (A53-54). Further, after speaking with Floyd at the ex parte hearing, the court noted that ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ There is no basis to disturb the court's credibility finding. *See United States v. Evans,* 98 F.4th 335, 337 (D.C. Cir. 2024) (district court's credibility determinations are "entitled to the greatest deference from this court on appeal").

## 2.    Floyd Has Not Established Prejudice.

Even if defense counsel acted deficiently in agreeing to include the § 2D1.1(b)(1) enhancement in the plea agreement, Floyd has failed to show that he was prejudiced as a result. Floyd's only claim of prejudice (at 24-26) is that the § 2D1.1(b)(1) enhancement in his plea agreement

PUBLIC COPY – SEALED MATERIAL REDACTED

increased his offense level by two levels, which in turn raised his guidelines range, and "resulted in a sentence higher than it probably would have been" otherwise.

Floyd does not claim, let alone demonstrate, that, but for his counsel's allegedly erroneous agreement to include the § 2D1.1(b)(1) enhancement in the plea agreement, there is a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial. *Hill,* 474 U.S. at 59; *Henderson,* 108 F.4th at 903. In fact, Floyd

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Thus, Floyd cannot show the prejudice necessary to prevail on his ineffectiveness claim. *See, e.g., United States v. Wilkins,* No. 23-3051, 2024 WL 4903512, at **2, 4 (D.C. Cir. Nov. 27, 2024) (defendant failed to establish prejudice to support ineffectiveness claim where he did not expressly assert that he would have gone to trial absent his attorney's purportedly deficient performance in pressuring him into accepting plea agreement); *Calderon,* 163 F.3d at 646 (rejecting claim that counsel was ineffective for agreeing to plea-agreement clause limiting legal grounds defendant could assert

41

to reduce her sentence where defendant did not allege she otherwise would have gone to trial).

Furthermore, as Floyd knew when he entered his plea agreement, the evidence against him was overwhelming. The evidence included Floyd's intercepted texts with his USVI cocaine supplier, within days of traveling to the USVI, arranging to obtain drugs (A61, A63-64). Further evidence showed that Floyd and Bennie then made a brief roundtrip to the USVI, where they were seen renting a car which Floyd later drove to a post office where Bennie mailed two packages, each containing over one kilogram of cocaine, to the District (A61-63). Search-warrant executions at three residences Floyd used revealed, inter alia, large amounts of cash, packaging and other drug-trafficking items, a loaded gun, and personal items belonging to Floyd (A64-65). Law-enforcement officers also observed Floyd distribute drugs from one of those residences (A64). Moreover, had Floyd not entered his guilty plea, he potentially would have faced three additional prosecutions for § 922(g)(1) offenses, as discussed supra at p.38 (A21, A64-66, A96-97). And, upon conviction at trial, Floyd would have faced a higher guidelines sentence than under his guilty plea because he would have lost the three point offense-level

PUBLIC COPY – SEALED MATERIAL REDACTED

reduction for acceptance of responsibility. Thus, he has not shown prejudice based on his counsels' acceptance of the plea agreement's § 2D1.1(b)(1) enhancement. *See United States v. Gonzalez-Arias,* 946 F.3d 17, 29 & n.7 (1st Cir. 2019) (in assessing claim of ineffective plea counsel, finding no reasonable probability defendant would have rejected plea deal given strength of evidence and fact he would have lost acceptance-of-responsibility points); *DiBiase v. United States*, 2023 WL 2376223, at \*4 (2d Cir. Mar. 7, 2023) ("even if DiBiase could show that counsel's advice was deficient, he has not shown a reasonable probability that he would have rejected the plea deal and insisted on going to trial had he been properly counseled" given that the plea "limited his likely sentencing exposure by avoiding mandatory consecutive sentences spanning decades on top of the sentences for the two counts to which he pled guilty").

Even under the prejudice standard Floyd mistakenly advances (at 25), he has not shown that, without his counsels' agreement to include the § 2D1.1(b)(1) enhancement in the plea agreement, there was "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a

sentence of less prison time." *United States v. Thomas,* 999 F.3d 723, 737 (D.C. Cir. 2021).[8] *See generally Premo v. Moore*, 562 U.S. 115, 129 (2011) (rejecting ineffectiveness claim where defense counsel encouraged client to enter early guilty plea; "[t]he bargain counsel struck was thus a favorable one—the statutory minimum for the charged offense—and the decision to forgo a challenge to the confession may have been essential to securing that agreement").

First, as explained supra, even at the ex parte hearing, Floyd ███ ████████████████████████████████████████████████████████ ██████████████████████ In assessing the prejudice prong of an ineffectiveness claim regarding a plea agreement, this Court should "look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee,* 582 U.S. at 369. Here, that evidence shows that Floyd ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[8] As explained supra at pp.30-32, because Floyd claims that his counsel rendered ineffective assistance in negotiating his plea agreement, the relevant prejudice standard is whether Floyd has shown a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial. *Hill,* 474 U.S. at 59.

PUBLIC COPY – SEALED MATERIAL REDACTED

Indeed, Floyd never filed a motion to withdraw his plea agreement.

Second, Floyd acknowledges (at 5) that the plea agreement's Statement of Offense (to which he agreed at the plea hearing: A40) stated that law-enforcement officers discovered at his W Street apartment $28,500, a scale for weighing drugs, a money counter, items used to distribute drugs, his passport and driver's license, and "a loaded Glock 19, 9mm firearm." Accordingly, the government could have used Floyd's constructive possession of this firearm as the basis for the § 2D1.1(b)(1) enhancement in the plea agreement in lieu of the guns Floyd mailed to St. Maarten. Given this alternative basis for the § 2D1.1(b)(1) enhancement, it is unreasonable to conclude that the government would have presented Floyd with a more lenient plea offer if his counsel had objected to the application of the § 2D1.1(b)(1) enhancement based on the St. Maarten guns. Thus, Floyd suffered no prejudice even if applying the § 2D1.1(b)(1) based on the St. Maarten guns was erroneous. *Thomas,* 999 F.3d at 737-38.

Because Floyd has not shown prejudice arising from his counsels' allegedly deficient performance, his ineffectiveness claim fails on that basis alone. *See Strickland,* 466 U.S. at 697, 700 (failure to demonstrate

PUBLIC COPY – SEALED MATERIAL REDACTED

prejudice alone defeats ineffectiveness claim).

### D. In Any Event, Floyd's Suggested Remedies Are Inappropriate.

Even if Floyd could demonstrate ineffective assistance, the remedies he seeks are inappropriate. First, Floyd contends (at 18, 21-23) that his counsels' alleged ineffectiveness with respect to the § 2D1.1(b)(1) enhancement rendered the entry of his guilty plea unknowing and involuntary. Yet, he claims (at 26) that the proper remedy is to vacate his sentence and remand for a resentencing without the § 2D1.1(b)(1) enhancement. This Court should not afford Floyd such a windfall remedy.[9]

"Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Lafler,* 566 U.S. at 170 (internal quotation marks and citation omitted). Thus, the remedy "must

---

[9] Floyd also seeks resentencing by a different judge (at 26), but cites no reason for this conclusory request, nor any legal authority to support it. Therefore, this Court should not entertain it. *See United States v. Hall,* 370 F.3d 1204, 1209 n.4 (D.C. Cir. 2004) ("one sentence, unaccompanied by argument or any citation to authority, does not preserve the issue for decision"). Indeed, there is no valid basis to reassign this case if this Court were to remand it.

PUBLIC COPY – SEALED MATERIAL REDACTED

neutralize the taint" of the constitutional violation, but "not grant a windfall to the defendant." *Id.* The proper remedy for ineffective assistance of counsel in plea bargaining is to permit Floyd to withdraw his guilty plea and return the parties to the negotiating table. *See Padilla v. Kentucky,* 559 U.S. 356, 372-73 (2010) ("The nature of relief secured by a successful collateral challenge to a guilty plea [is] an opportunity to withdraw the plea and proceed to trial"). The remedy Floyd seeks would grant him a windfall by allowing him to be resentenced to a more lenient version of his plea agreement, which the parties never executed. Neither this Court nor the district court may modify or amend a plea agreement. *United States v. Scanlon,* 666 F.3d 796, 798-99 (D.C. Cir. 2012).

Second, there is no basis to grant Floyd's alternative request (at 26) for a remand to develop the record of his ineffectiveness claim. This Court generally does not resolve ineffectiveness claims on direct appeal except in those cases where "the record is so clear that remand is unnecessary." *United States v. Soto,* 132 F.3d 56, 59 (D.C. Cir. 1997). However, this Court has elected not to remand ineffectiveness claims for an evidentiary hearing where, as here, the record "clearly shows that the challenged attorney actions were not deficient," or "that the defendant was not

47

prejudiced." *United States v. Sitzmann,* 893 F.3d 811, 831-32 (D.C. Cir. 2018) (citations omitted); *see also Thomas,* 999 F.3d at 735, 738 (declining to remand for evidentiary hearing on ineffectiveness claim raised for first time on direct appeal because defendant could not show prejudice). Because Floyd has not established either deficient performance or prejudice, there is no basis to remand.

Furthermore, unlike a case in which a defendant has raised an ineffectiveness claim for the first time on appeal, Floyd has already presented his claim to the district court, which heard from both Floyd and his counsel during the ex parte hearing and ruled that there was no evidence of ineffective assistance (A171-85). Floyd does not assert that there are gaps in the record that necessitate an evidentiary hearing. Thus, there is no basis to remand for an evidentiary hearing. *Cf. United States v. Rashad,* 331 F.3d 908, 909-10 (D.C. Cir. 2003) (remand appropriate where defendant asserts ineffectiveness claim for first time on direct appeal and it is likely that relevant facts will not be in trial record).

48

PUBLIC COPY – SEALED MATERIAL REDACTED

# CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
ANTHONY F. SCARPELLI
DAVID T. HENEK
Assistant United States Attorneys

_____/s/_____
KATHERINE M. KELLY
D.C. Bar #447112
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
(202) 252-6829

49

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(a)(7)(C) that this brief contains 9353 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
KATHERINE M. KELLY
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee – Public Copy to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Elita C. Amato, Esq., The Law Office of Elita C. Amato, 2111 Wilson Blvd., 8th Floor, Arlington, VA 22201, on this 25th day of April, 2025.

/s/
KATHERINE M. KELLY
Assistant United States Attorney

# Addendum

# Addendum of 2021 Sentencing Guidelines

U.S.S.G. § 1B1.3......................................................................A-1

U.S.S.G. § 3E1.1.....................................................................A-11

be applied as if the defendant had been convicted on one count of conspiracy to commit the first robbery, one count of conspiracy to commit the second robbery, and one count of conspiracy to commit the third robbery.

4.  Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy count would be grouped together under §3D1.2(d) (*e.g.*, a conspiracy to steal three government checks) it is not necessary to engage in the foregoing analysis, because §1B1.3(a)(2) governs consideration of the defendant's conduct.

| *Historical Note* | Effective November 1, 1987. Amended effective January 15, 1988 (amendment 2); November 1, 1989 (amendments 73–75 and 303); November 1, 1991 (amendment 434); November 1, 1992 (amendment 438); November 1, 2000 (amendment 591); November 1, 2001 (amendments 613 and 617). |
|---|---|

## §1B1.3.   Relevant Conduct (Factors that Determine the Guideline Range)

(a)  CHAPTERS TWO (OFFENSE CONDUCT) AND THREE (ADJUSTMENTS). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)  (A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

(i)   within the scope of the jointly undertaken criminal activity,

(ii)  in furtherance of that criminal activity, and

(iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

      (2)   solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

      (3)   all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

      (4)   any other information specified in the applicable guideline.

  (b)  CHAPTERS FOUR (CRIMINAL HISTORY AND CRIMINAL LIVELIHOOD) AND FIVE (DETERMINING THE SENTENCE). Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines.

### Commentary

**Application Notes:**

1.   **Sentencing Accountability and Criminal Liability.**—The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.

2.   **Accountability Under More Than One Provision.**—In certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. If a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established.

3.   **Jointly Undertaken Criminal Activity (Subsection (a)(1)(B)).**—

  (A)  **In General.**—A "*jointly undertaken criminal activity*" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy.

     In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was:

     (i)   within the scope of the jointly undertaken criminal activity;

     (ii)  in furtherance of that criminal activity; and

     (iii) reasonably foreseeable in connection with that criminal activity.

     The conduct of others that meets all three criteria set forth in subdivisions (i) through (iii) (*i.e.*, "within the scope," "in furtherance," and "reasonably foreseeable") is relevant conduct under this provision. However, when the conduct of others does not meet any one of the

criteria set forth in subdivisions (i) through (iii), the conduct is not relevant conduct under this provision.

(B)  **Scope.**—Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the "jointly undertaken criminal activity" is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement). In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).

In cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken criminal activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.

A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct (*e.g.*, in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level). The Commission does not foreclose the possibility that there may be some unusual set of circumstances in which the exclusion of such conduct may not adequately reflect the defendant's culpability; in such a case, an upward departure may be warranted.

(C)  **In Furtherance.**—The court must determine if the conduct (acts and omissions) of others was in furtherance of the jointly undertaken criminal activity.

(D)  **Reasonably Foreseeable.**—The court must then determine if the conduct (acts and omissions) of others that was within the scope of, and in furtherance of, the jointly undertaken criminal activity was reasonably foreseeable in connection with that criminal activity.

Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was within the scope of the jointly undertaken criminal activity (the robbery), was in furtherance of that criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

With respect to offenses involving contraband (including controlled substances), the defendant is accountable under subsection (a)(1)(A) for all quantities of contraband with which he

was directly involved and, in the case of a jointly undertaken criminal activity under subsection (a)(1)(B), all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity.

The requirement of reasonable foreseeability applies only in respect to the conduct (*i.e.*, acts and omissions) of others under subsection (a)(1)(B). It does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes; such conduct is addressed under subsection (a)(1)(A).

4.  **Illustrations of Conduct for Which the Defendant is Accountable under Subsections (a)(1)(A) and (B).—**

    (A)  **Acts and omissions aided or abetted by the defendant.—**

        (i)  Defendant A is one of ten persons hired by Defendant B to off-load a ship containing marihuana. The off-loading of the ship is interrupted by law enforcement officers and one ton of marihuana is seized (the amount on the ship as well as the amount off-loaded). Defendant A and the other off-loaders are arrested and convicted of importation of marihuana. Regardless of the number of bales he personally unloaded, Defendant A is accountable for the entire one-ton quantity of marihuana. Defendant A aided and abetted the off-loading of the entire shipment of marihuana by directly participating in the off-loading of that shipment (*i.e.*, the specific objective of the criminal activity he joined was the off-loading of the entire shipment). Therefore, he is accountable for the entire shipment under subsection (a)(1)(A) without regard to the issue of reasonable foreseeability. This is conceptually similar to the case of a defendant who transports a suitcase knowing that it contains a controlled substance and, therefore, is accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance.

        In certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. As noted in the preceding paragraph, Defendant A is accountable for the entire one-ton shipment of marihuana under subsection (a)(1)(A). Defendant A also is accountable for the entire one-ton shipment of marihuana on the basis of subsection (a)(1)(B) (applying to a jointly undertaken criminal activity). Defendant A engaged in a jointly undertaken criminal activity and all three criteria of subsection (a)(1)(B) are met. First, the conduct was within the scope of the criminal activity (the importation of the shipment of marihuana). Second, the off-loading of the shipment of marihuana was in furtherance of the criminal activity, as described above. And third, a finding that the one-ton quantity of marihuana was reasonably foreseeable is warranted from the nature of the undertaking itself (the importation of marihuana by ship typically involves very large quantities of marihuana). The specific circumstances of the case (the defendant was one of ten persons off-loading the marihuana in bales) also support this finding. In an actual case, of course, if a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established. *See* Application Note 2.

    (B)  **Acts and omissions aided or abetted by the defendant; acts and omissions in a jointly undertaken criminal activity.—**

        (i)  Defendant C is the getaway driver in an armed bank robbery in which $15,000 is taken and a teller is assaulted and injured. Defendant C is accountable for the money

taken under subsection (a)(1)(A) because he aided and abetted the act of taking the money (the taking of money was the specific objective of the offense he joined). Defendant C is accountable for the injury to the teller under subsection (a)(1)(B) because the assault on the teller was within the scope and in furtherance of the jointly undertaken criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

As noted earlier, a defendant may be accountable for particular conduct under more than one subsection. In this example, Defendant C also is accountable for the money taken on the basis of subsection (a)(1)(B) because the taking of money was within the scope and in furtherance of the jointly undertaken criminal activity (the robbery), and was reasonably foreseeable (as noted, the taking of money was the specific objective of the jointly undertaken criminal activity).

(C)    **Requirements that the conduct of others be within the scope of the jointly under-taken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable.—**

(i)    Defendant D pays Defendant E a small amount to forge an endorsement on an $800 stolen government check. Unknown to Defendant E, Defendant D then uses that check as a down payment in a scheme to fraudulently obtain $15,000 worth of merchandise. Defendant E is convicted of forging the $800 check and is accountable for the forgery of this check under subsection (a)(1)(A). Defendant E is not accountable for the $15,000 because the fraudulent scheme to obtain $15,000 was not within the scope of the jointly undertaken criminal activity (*i.e.*, the forgery of the $800 check).

(ii)    Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the entire amount ($55,000). Each defendant is accountable for the amount he personally obtained under subsection (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was within the scope of the jointly undertaken criminal activity (the scheme to sell fraudulent stocks), was in furtherance of that criminal activity, and was reasonably foreseeable in connection with that criminal activity.

(iii)    Defendants H and I engaged in an ongoing marihuana importation conspiracy in which Defendant J was hired only to help off-load a single shipment. Defendants H, I, and J are included in a single count charging conspiracy to import marihuana. Defendant J is accountable for the entire single shipment of marihuana he helped import under subsection (a)(1)(A) and any acts and omissions of others related to the importation of that shipment on the basis of subsection (a)(1)(B) (*see* the discussion in example (A)(i) above). He is not accountable for prior or subsequent shipments of marihuana imported by Defendants H or I because those acts were not within the scope of his jointly undertaken criminal activity (the importation of the single shipment of marihuana).

(iv)    Defendant K is a wholesale distributor of child pornography. Defendant L is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K. Similarly, Defendant M is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K. Defendants L and M are aware of each other's criminal activity but operate independently. Defendant N is Defendant K's assistant who recruits customers for Defendant K and frequently supervises

the deliveries to Defendant K's customers. Each defendant is convicted of a count charging conspiracy to distribute child pornography. Defendant K is accountable under subsection (a)(1)(A) for the entire quantity of child pornography sold to Defendants L and M. Defendant N also is accountable for the entire quantity sold to those defendants under subsection (a)(1)(B) because the entire quantity was within the scope of his jointly undertaken criminal activity (to distribute child pornography with Defendant K), in furtherance of that criminal activity, and reasonably foreseeable. Defendant L is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K because he is not engaged in a jointly undertaken criminal activity with the other defendants. For the same reason, Defendant M is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K.

(v)   Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable under subsection (a)(1)(A) for the drug quantity involved on that one occasion. Defendant O is not accountable for the other drug sales made by her boyfriend because those sales were not within the scope of her jointly undertaken criminal activity (i.e., the one delivery).

(vi)  Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity.

(vii) Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R. Defendant S is not accountable under subsection (a)(1)(B) for the other quantities imported by Defendant R because those quantities were not within the scope of his jointly undertaken criminal activity (i.e., the 500 grams).

(viii) Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana (subsection (a)(1)(B)), and aided and abetted each other's actions (subsection (a)(1)(A)) in carrying out the jointly undertaken criminal activity (which under subsection (a)(1)(B) were also in furtherance of, and reasonably foreseeable in connection with, the criminal activity). In contrast, if Defendants T, U, V, and W were hired individually, transported their individual shipments

at different times, and otherwise operated independently, each defendant would be accountable only for the quantity of marihuana he personally transported (subsection (a)(1)(A)). As this example illustrates, the scope of the jointly undertaken criminal activity may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities. *See* Application Note 3(B).

5.  **Application of Subsection (a)(2).—**

    (A)  **Relationship to Grouping of Multiple Counts.—**"Offenses of a character for which §3D1.2(d) would require grouping of multiple counts," as used in subsection (a)(2), applies to offenses for which grouping of counts would be required under §3D1.2(d) had the defendant been convicted of multiple counts. Application of this provision does not require the defendant, in fact, to have been convicted of multiple counts. For example, where the defendant engaged in three drug sales of 10, 15, and 20 grams of cocaine, as part of the same course of conduct or common scheme or plan, subsection (a)(2) provides that the total quantity of cocaine involved (45 grams) is to be used to determine the offense level even if the defendant is convicted of a single count charging only one of the sales. If the defendant is convicted of multiple counts for the above noted sales, the grouping rules of Chapter Three, Part D (Multiple Counts) provide that the counts are grouped together. Although Chapter Three, Part D (Multiple Counts) applies to multiple counts of conviction, it does not limit the scope of subsection (a)(2). Subsection (a)(2) merely incorporates by reference the types of offenses set forth in §3D1.2(d); thus, as discussed above, multiple counts of conviction are not required for subsection (a)(2) to apply.

    As noted above, subsection (a)(2) applies to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, had the defendant been convicted of multiple counts. For example, the defendant sells 30 grams of cocaine (a violation of 21 U.S.C. § 841) on one occasion and, as part of the same course of conduct or common scheme or plan, attempts to sell an additional 15 grams of cocaine (a violation of 21 U.S.C. § 846) on another occasion. The defendant is convicted of one count charging the completed sale of 30 grams of cocaine. The two offenses (sale of cocaine and attempted sale of cocaine), although covered by different statutory provisions, are of a character for which §3D1.2(d) would require the grouping of counts, had the defendant been convicted of both counts. Therefore, subsection (a)(2) applies and the total amount of cocaine (45 grams) involved is used to determine the offense level.

    (B)  **"Same Course of Conduct or Common Scheme or Plan".—**"Common scheme or plan" and "same course of conduct" are two closely related concepts.

        (i)  **Common scheme or plan.** For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; *i.e.*, the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of *modus operandi* (the same or similar computer manipulations were used to execute the scheme).

(ii) **Same course of conduct**. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (*e.g.*, a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

(C) **Conduct Associated with a Prior Sentence.**—For the purposes of subsection (a)(2), offense conduct associated with a sentence that was imposed prior to the acts or omissions constituting the instant federal offense (the offense of conviction) is not considered as part of the same course of conduct or common scheme or plan as the offense of conviction.

**Examples:** (1) The defendant was convicted for the sale of cocaine and sentenced to state prison. Immediately upon release from prison, he again sold cocaine to the same person, using the same accomplices and *modus operandi*. The instant federal offense (the offense of conviction) charges this latter sale. In this example, the offense conduct relevant to the state prison sentence is considered as prior criminal history, not as part of the same course of conduct or common scheme or plan as the offense of conviction. The prior state prison sentence is counted under Chapter Four (Criminal History and Criminal Livelihood). (2) The defendant engaged in two cocaine sales constituting part of the same course of conduct or common scheme or plan. Subsequently, he is arrested by state authorities for the first sale and by federal authorities for the second sale. He is convicted in state court for the first sale and sentenced to imprisonment; he is then convicted in federal court for the second sale. In this case, the cocaine sales are not separated by an intervening sentence. Therefore, under subsection (a)(2), the cocaine sale associated with the state conviction is considered as relevant conduct to the instant federal offense. The state prison sentence for that sale is not counted as a prior sentence; *see* §4A1.2(a)(1).

Note, however, in certain cases, offense conduct associated with a previously imposed sentence may be expressly charged in the offense of conviction. Unless otherwise provided, such conduct will be considered relevant conduct under subsection (a)(1), not (a)(2).

6. **Application of Subsection (a)(3).**—

(A) **Definition of "Harm".**—"*Harm*" includes bodily injury, monetary loss, property damage and any resulting harm.

(B) **Risk or Danger of Harm.**—If the offense guideline includes creating a risk or danger of harm as a specific offense characteristic, whether that risk or danger was created is to be considered in determining the offense level. *See, e.g.*, §2K1.4 (Arson; Property Damage by Use of Explosives); §2Q1.2 (Mishandling of Hazardous or Toxic Substances or Pesticides). If, however, the guideline refers only to harm sustained (*e.g.*, §2A2.2 (Aggravated Assault); §2B3.1 (Robbery)) or to actual, attempted or intended harm (*e.g.*, §2B1.1 (Theft, Property Destruction, and Fraud); §2X1.1 (Attempt, Solicitation, or Conspiracy)); the risk created enters into the determination of the offense level only insofar as it is incorporated into the

base offense level. Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred. In a case in which creation of risk is not adequately taken into account by the applicable offense guideline, an upward departure may be warranted. *See generally* §1B1.4 (Information to be Used in Imposing Sentence); §5K2.0 (Grounds for Departure). The extent to which harm that was attempted or intended enters into the determination of the offense level should be determined in accordance with §2X1.1 (Attempt, Solicitation, or Conspiracy) and the applicable offense guideline.

7.  **Factors Requiring Conviction under a Specific Statute.**—A particular guideline (in the base offense level or in a specific offense characteristic) may expressly direct that a particular factor be applied only if the defendant was convicted of a particular statute. For example, in §2S1.1 (Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity), subsection (b)(2)(B) applies if the defendant "was convicted under 18 U.S.C. § 1956". Unless such an express direction is included, conviction under the statute is not required. Thus, use of a statutory reference to describe a particular set of circumstances does not require a conviction under the referenced statute. An example of this usage is found in §2A3.4(a)(2) ("if the offense involved conduct described in 18 U.S.C. § 2242").

    Unless otherwise specified, an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy, attempt, solicitation, aiding or abetting, accessory after the fact, or misprision of felony in respect to that particular statute. For example, §2S1.1(b)(2)(B) (which is applicable only if the defendant is convicted under 18 U.S.C. § 1956) would be applied in determining the offense level under §2X3.1 (Accessory After the Fact) in a case in which the defendant was convicted of accessory after the fact to a violation of 18 U.S.C. § 1956 but would not be applied in a case in which the defendant is convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957. *See* Application Note 3(C) of §2S1.1.

8.  **Partially Completed Offense.**—In the case of a partially completed offense (*e.g.*, an offense involving an attempted theft of $800,000 and a completed theft of $30,000), the offense level is to be determined in accordance with §2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both. *See* Application Note 4 in the Commentary to §2X1.1. Note, however, that Application Note 4 is not applicable where the offense level is determined under §2X1.1(c)(1).

9.  **Solicitation, Misprision, or Accessory After the Fact.**—In the case of solicitation, misprision, or accessory after the fact, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant.

**Background:** This section prescribes rules for determining the applicable guideline sentencing range, whereas §1B1.4 (Information to be Used in Imposing Sentence) governs the range of information that the court may consider in adjudging sentence once the guideline sentencing range has been determined. Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined.

Subsection (a) establishes a rule of construction by specifying, in the absence of more explicit instructions in the context of a specific guideline, the range of conduct that is relevant to determining the applicable offense level (except for the determination of the applicable offense guideline, which is

**A-9**

governed by §1B1.2(a)). No such rule of construction is necessary with respect to Chapters Four and Five because the guidelines in those Chapters are explicit as to the specific factors to be considered.

Subsection (a)(2) provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain property, tax, fraud and drug offenses for which the guidelines depend substantially on quantity, than with respect to other offenses such as assault, robbery and burglary. The distinction is made on the basis of §3D1.2(d), which provides for grouping together (*i.e.*, treating as a single count) all counts charging offenses of a type covered by this subsection. However, the applicability of subsection (a)(2) does not depend upon whether multiple counts are alleged. Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction. Similarly, in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction. On the other hand, in a robbery case in which the defendant robbed two banks, the amount of money taken in one robbery would *not* be taken into account in determining the guideline range for the other robbery, even if both robberies were part of a single course of conduct or the same scheme or plan. (This is true whether the defendant is convicted of one or both robberies.)

Subsections (a)(1) and (a)(2) adopt different rules because offenses of the character dealt with in subsection (a)(2) (*i.e.*, to which §3D1.2(d) applies) often involve a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing. For example, a pattern of embezzlement may consist of several acts of taking that cannot separately be identified, even though the overall conduct is clear. In addition, the distinctions that the law makes as to what constitutes separate counts or offenses often turn on technical elements that are not especially meaningful for purposes of sentencing. Thus, in a mail fraud case, the scheme is an element of the offense and each mailing may be the basis for a separate count; in an embezzlement case, each taking may provide a basis for a separate count. Another consideration is that in a pattern of small thefts, for example, it is important to take into account the full range of related conduct. Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses. Conversely, when §3D1.2(d) does not apply, so that convictions on multiple counts are considered separately in determining the guideline sentencing range, the guidelines prohibit aggregation of quantities from other counts in order to prevent "double counting" of the conduct and harm from each count of conviction. Continuing offenses present similar practical problems. The reference to §3D1.2(d), which provides for grouping of multiple counts arising out of a continuing offense when the offense guideline takes the continuing nature into account, also prevents double counting.

Subsection (a)(4) requires consideration of any other information specified in the applicable guideline. For example, §2A1.4 (Involuntary Manslaughter) specifies consideration of the defendant's state of mind; §2K1.4 (Arson; Property Damage By Use of Explosives) specifies consideration of the risk of harm created.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective January 15, 1988 (amendment 3); November 1, 1989 (amendments 76–78 and 303); November 1, 1990 (amendment 309); November 1, 1991 (amendment 389); November 1, 1992 (amendment 439); November 1, 1994 (amendment 503); November 1, 2001 (amendments 617 and 634); November 1, 2004 (amendment 674); November 1, 2010 (amendment 746); November 1, 2015 (amendments 790 and 797). |

§3E1.1

# PART E — ACCEPTANCE OF RESPONSIBILITY

## §3E1.1.    Acceptance of Responsibility

   (a)  If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.

   (b)  If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level **16** or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by **1** additional level.

**Commentary**

**Application Notes:**

1. In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:

   (A)  truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous;

   (B)  voluntary termination or withdrawal from criminal conduct or associations;

   (C)  voluntary payment of restitution prior to adjudication of guilt;

   (D)  voluntary surrender to authorities promptly after commission of the offense;

   (E)  voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

   (F)  voluntary resignation from the office or position held during the commission of the offense;

   (G)  post-offense rehabilitative efforts (*e.g.*, counseling or drug treatment); and

   (H)  the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

**A-11**

2. This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

3. Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3 (Relevant Conduct) (*see* Application Note 1(A)), will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

4. Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply.

5. The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.

6. Subsection (a) provides a 2-level decrease in offense level. Subsection (b) provides an additional 1-level decrease in offense level for a defendant at offense level 16 or greater prior to the operation of subsection (a) who both qualifies for a decrease under subsection (a) and who has assisted authorities in the investigation or prosecution of his own misconduct by taking the steps set forth in subsection (b). The timeliness of the defendant's acceptance of responsibility is a consideration under both subsections, and is context specific. In general, the conduct qualifying for a decrease in offense level under subsection (b) will occur particularly early in the case. For example, to qualify under subsection (b), the defendant must have notified authorities of his intention to enter a plea of guilty at a sufficiently early point in the process so that the government may avoid preparing for trial and the court may schedule its calendar efficiently.

Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing. *See* section 401(g)(2)(B) of Public Law 108–21. The government should not withhold such a motion based on interests not identified in §3E1.1, such as whether the defendant agrees to waive his or her right to appeal.

If the government files such a motion, and the court in deciding whether to grant the motion also determines that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, the court should grant the motion.

**Background:** The reduction of offense level provided by this section recognizes legitimate societal interests. For several reasons, a defendant who clearly demonstrates acceptance of responsibility for

§3E1.1

his offense by taking, in a timely fashion, the actions listed above (or some equivalent action) is appropriately given a lower offense level than a defendant who has not demonstrated acceptance of responsibility.

Subsection (a) provides a 2-level decrease in offense level. Subsection (b) provides an additional 1-level decrease for a defendant at offense level 16 or greater prior to operation of subsection (a) who both qualifies for a decrease under subsection (a) and has assisted authorities in the investigation or prosecution of his own misconduct by taking the steps specified in subsection (b). Such a defendant has accepted responsibility in a way that ensures the certainty of his just punishment in a timely manner, thereby appropriately meriting an additional reduction. Subsection (b) does not apply, however, to a defendant whose offense level is level 15 or lower prior to application of subsection (a). At offense level 15 or lower, the reduction in the guideline range provided by a 2-level decrease in offense level under subsection (a) (which is a greater proportional reduction in the guideline range than at higher offense levels due to the structure of the Sentencing Table) is adequate for the court to take into account the factors set forth in subsection (b) within the applicable guideline range.

Section 401(g) of Public Law 108–21 directly amended subsection (b), Application Note 6 (including adding the first sentence of the second paragraph of that application note), and the Background Commentary, effective April 30, 2003.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective January 15, 1988 (amendment 46); November 1, 1989 (amendment 258); November 1, 1990 (amendment 351); November 1, 1992 (amendment 459); April 30, 2003 (amendment 649); November 1, 2010 (amendments 746 and 747); November 1, 2013 (amendment 775); November 1, 2018 (amendment 810). |